The case next for argument is Bacy v. Chickasaw Nation Industries. It is docket 20-6087. And Mr. Batten, we are ready to hear your argument when you're ready to deliver it. Thank you, Your Honor. May it please the court and counsel. Your Honors, this case is simple and complicated at the same time. We believe that we have shown at the summary judgment stage that there were significant questions of fact and circumstantial evidence that indicated a number of different facts in this matter. The case involves a lady who has been an FAA contract employee for over 30 years, never had any prior disciplinary actions, support for her family, and liked what she did, and never had any disciplinary issues taken against her. And her personality is the type that she would never ever raise her voice, do anything that was aggressive. And yet, all of a sudden, when they had to switch over with the tribe taking over, then she became a co-worker, became her supervisor, and things went downhill from there. One of the issues I think that cites this case is that they claim that they did an investigation, and what we were trying to do is point out the problems with the investigation. It was not properly done. And let me ask you, your claim that it wasn't properly done seems to be based primarily on the amount of time it took to do it. I don't see anywhere where you've pointed to other witnesses that should have been interviewed or other documents that should have been reviewed. Is there something there? Yes. Look at the affidavit, first of all. Mr. Gross files an affidavit, but he doesn't cite the fact that he decided to take any action. He just states what he did. In 1994, they submitted an email that says that after consulting with three supervisors, approached her, and they were talking about Wendy Hutton, examined situations, and they recommended taking her badge. Well, that indicates that the supervisor, Sandy Laminack, had the authority to take her badge, and she wasn't even her supervisor. And there's no indication that had such authority. The other issue was that they didn't talk to anybody else. And if you look at the statement at their document 192 that they submitted, in there they talked about Conrad Enos, who is her friend, also a black employee, who's a supervisor, and that was her supervisor. Well, the minute that he doesn't take action on her, they're recommending action against him. When she comes back to him and explains what happened down there, they jump on him for allowing or not backing them up or taking her badge or doing something. That rendition in and of itself seems pretty weird all within a day. I mean, this happened at one o'clock or 1 30 in the afternoon. This all came down. As I understand it, there was an incident of insubordination where Ms. Bassey was involved in a screaming argument with her supervisor, and the investigation by Ms. Hutton included the witness to that and the two people that were in the conversation. I mean, if the issue is what happened during that alleged incident of insubordination, who else do you have to talk to? Well, talk to Ms. Bassey is one. Well, they did talk to Ms. Bassey. Just briefly on the phone. She called her and talked to her on the phone on the way home. She called Ms. Hutton on the way home. Her testimony was, I talked to her briefly on the way home. She took this document in there. As I said about the investigation, if you look at page 300, we added in what the responsibilities of C&I on these investigations. C&I page 300, humans resources department will, one, review the situation, two, schedule a meeting between the employee, the supervisor or manager and department head, and if the issue is still unresolved, then maybe meeting may be scheduled with the executive management. None of that was done. At page 294, it says an employee will not be retaliated against for raising work-related concerns that are brought forward with a good faith belief that a legitimate problem exists. She walked down there with a problem with the way this was handled and what she described throughout her testimony was that this was unusual. Camille Wade was a black female. She felt that she was being targeted, so she brought it down to Ms. Lamachick. At that point in time, there was two other people in there, and they turned around, got up and walked out when Ms. Lamachick started yelling. Ms. Lamachick, according to my client's phone, was yelling and screaming at her to be quiet. She left, and the lady wanted her badge because she was not going to listen to her. The only person I talked to was on the other phone, and the only thing we can understand is that what he was testifying to was Ms. Lamachick screaming. He wasn't there. He was on the phone. Yet, he comes up with these statements, unverified statements that pop in him trying to explain what he saw as another supervisor I mean, that's a question for the jury whether that's even accurate or not, whatever. I mean, the pretext of what we have to show by pretext is what was a legitimate concern of the employer at that point in time. They hadn't even got to it. They take a 30-year employee who's never been disciplined, any kind of serious discipline, and she's running afoul right now with Ms. Lamachick, who is going over and above her authority. She treats Mr. Enos as though he's her employee, and he's a supervisor with far more experience and years of experience than Ms. Lamachick. They were both supposedly on the same level, yet she's the one that's complaining. Tell me again that the two witnesses who were in the office and left, they supported Ms. Bassey's account? That's what you're saying the record will show? They never talked to him. My understanding is they just got left when Ms. Lamachick walked out the door. She identified them, and she said when they walked out the door, they were never interviewed. They should have been interviewed. Part of this policy, and we listed all these policies for SAIC and how they treat their employees and the integrity that they work these things with and the value we showed in their 10K issue was that they want these people to stay on that have institutional knowledge, long-standing history that helps keep this facility functioning. When Ms. Bassey hired on, they were there the first day. SAIC was there telling her she's going to be here for a while. She's not going to get thrown out the door, and then SAIC retains C&I to run this portion of the operation for the FAA. Other than the one comment about the police shooting, do you point to any other evidence of racial animus on the part of Ms. Lamachick? There was, yes. And where is it? Because I haven't found it in your briefs. The issue was, I think we tried to identify it through some of the other incidences with the other people in her affidavit. There was a lady that was only supposed to only be allowed once. It was terminated when another white employee was given three times to pass the test. Multiple times in the past history in her testimony was that those people get the pass more than once. If I didn't identify it, I'll find that in there. No, that's in there, but there's also the responses that that was a decision that was often made by the FAA, the testing, what was required and who could retake. Well, the FAA wasn't involved in passing the test. They say whether you pass the test or not, they don't care whether or not you have multiple opportunities to pass it. They're giving them over the history, and I believe it was in her testimony, over the history, they allow them multiple times to perform this test. It's a pass-fail. Once you finally get it, it's a training opportunity. They put a lot of time into these people and want to get them trained so they can perform their duties as the remote pilot operators. But if you look at, you know, the question is whether Ms. Basie or not would have raised her voice. I mean, that's not in her personality. And that's where we think a jury could decide whether or not they would believe her side of the story versus Sandy Lemonick's side of the story. I mean, that's where it stops. Well, you have Mr. Wise. Doesn't Mr. Wise know each of their voices and doesn't he identify Ms. Basie as the one who's yelling? There's no testimony to that. He just said he heard this. There's notes in the statement. It wasn't identified or there wasn't any affidavit from it. It's just some notes. He supposedly talked to it. So we didn't believe that was even admissible because that was just a statement as part of the investigation, but they only talked to them. Did they talk to Conrad Enos about her history and what she actually said? There's no statement from Conrad Enos except a little brief thing that they said that she came up here and said this and she didn't understand why the lady was yelling at her. And then they identified we're going to punish you for not doing something different. So, I mean, they're another black employee who's been there much longer than Sandy Lemonick. They're jumping on him already. He was the supervisor of Ms. Targulich. That's not part of their investigation. I mean, their investigation was what happened during this I think it's Ms. Hutton concluded that it was Ms. Bassey who was out of line and screaming at her supervisor. And, you know, we aren't the HR department. The issue for us is whether you've shown us anything to suggest that they didn't reasonably believe that they didn't believe that. Because if they believed it, then they have the right to discipline as a result of it. Right? They have a right to discipline. We're not going to challenge that. But under the years and their policies, their own policies and the policies of SAIC is that the discipline should be reasonable, progressive and look into it. You know, my experience with HR departments usually go or when they're investigating it, they try to do an independent evaluation. If you look at this, this was nothing. This was not an independent evaluation. This was internal. And Ms. Hutton doesn't say anything in her affidavit that she recommends that she be terminated. There's no affidavit. And then Brian Groves says she recommended in his email, she recommended she be terminated. You know, I mean, so we're throwing it all back on Wendy in her notes, supposedly the notes they attach later on, they're not identified or signed or anything. She says, well, I recommend this. That's all this transpired. She was letting go Thursday morning, the 13th at 10 o'clock when he writes, sends that email, we're done. She Wednesday afternoon, the 11th, after one o'clock, they start this thing. So on the 12th, they run through this and quickly go through it. They don't call her in. They don't talk to it. They don't sit down and say, what is the resolution? How did this come about? There's nobody at the FAA that I've talked to. Where did this piece of paper come from? Because the issue that I think she was concerned with, Sandy brought this piece of paper up when it was Conrad's floor. It was not her floor. It was his floor. So she brings it up and gives it to him. And he gives it to Ms. Basie. And she says, this is wrong. And she goes down to give it back to her. And we've established that the we found a prima facie case. The issue is pretext. And I think that we can show that this was pretextual. I would like to reserve the remaining two minutes and 11 seconds, 10 seconds. Very well. Ms. Tran. May it please the court. My name is Kim Tran, and I represent the appellees in this case, which I will refer to collectively as CNI. CNI respectfully requests that this court affirm the decision of the district court dismissing appellant's discrimination claims. Your honors, this case can be summed up easily as a case of unsupported speculation. The case involves a two-year employee of CNI who claims she was subjected to a hostile work environment claim based on a single comment by a single supervisor, Sandy Laminack. She also claims her termination was racially motivated by this supervisor who was indisputably not the decision maker in her termination. The most direct response today that I can give to offer this court as to appellant's arguments is that appellant has offered the lower court and the appellate court opinions, not facts. And her opinions are irrelevant and not supported in the record. First, CNI was appellant's employer, not SAIC. The documents related and attached that are SAIC press release and SAIC policies, those exhibits are irrelevant. And the appellant has not provided the court with any legal authority or any facts in the record that support the fact that they are relevant to this case. The other arguments the appellant makes are equity arguments, arguments related to the appellant's alleged past performance, her financial condition, her mental state, her personality. These equity arguments are not proof of pretext. They also are not proof of any sort of racial animus. Well, when you say they're not proof of pretext, you know, if typically they don't, on the first infraction, fire a 30-year employee, then you could argue that something else is going on here, couldn't you? If that were the case, but that is not the case here, because Ms. Bassey, the appellant, one, was not a 30-year employee. She was a two-year employee. CNI took over the contract in September 2015, and she was terminated in 2017. Secondly, the appellant has not offered any comparators and the identification of any individuals or any policies that state that you can't be terminated on a first infraction. CNI's policy allows for the termination based on insubordinate conduct. There's not a measured system that requires a certain number of policy and violations in order to be terminated, and the appellant has not produced any evidence of that fact. Why is there not a genuine issue of material fact on who was yelling? That's a good question, Your Honor. When it comes to who is yelling, for the purposes of the motion for summary judgment, you can infer that it was that the appellant's interpretation of what happened, that she was not yelling. You can assume that to be true, but that doesn't matter. That, in and of itself, that alleged false accusation of her yelling is not what creates pretext. It's about what facts the decision-makers had and whether or not, based on those facts, they honestly arrived at the conclusion they did, that it was Ms. Basie, the appellant, who was the one yelling that day. Here, when we look at the investigation that was conducted, it was an investigation that included three supervisors, Ms. Laminack, Mr. Ennis, and Mr. Wise. Mr. Ennis and Mr. Wise did offer statements about all of the things that the appellant is supposedly concerned about, about the form and where it originated. In fact, she even admitted in her deposition that that form was actually originated by an SAIC instructor. It was constructive criticism given to her RPO trainee that doesn't get placed in a personnel file, doesn't affect anyone's pay, salary, or benefits. But for whatever reason, she was upset about the form. And even though Ennis told Hutton that he had informed her that this was from Mark and that she said, I'm going to go talk to Mark, she instead went to see Ms. Laminack. And at that point, Mr. Wise provides a statement to Ms. Hutton that he overheard Ms. Basie yelling and he overheard Ms. Laminack tell her to turn in her headset and badge and go home. Instead, she chose not to go home and she went and spoke to Mr. Ennis. And Mr. Ennis also made Ms. Hutton aware of that conversation too. When we look at this, now the appellant offers that there are somehow two other witnesses in the room. The reason why the appellant never names who those witnesses are, because the appellant has no idea who they are. That's not in the evidence. It's not in the record evidence. There's no evidence that anyone else was there or should have been there or should have been questioned. And this court is not required to question the adequacy of this investigation. The court is here to determine whether or not the facts before the decision makers is when Ms. Hutton and Mr. Gross, whether the facts that they reviewed and the conclusion they come up with, was somehow unworthy of belief. This case is very similar, in fact, to the Kendrick Vipenski case, which was a case of an African-American truck driver who was accused of speeding, who later had a confrontation with his supervisor, and his supervisor claimed that he was shoved and yelled at. And the Tenth Circuit in that case looked at that accusation of shoving and yelling and said, okay, we're going to look at that and presume that the truck driver's assertion is correct. He did not shove and yell at the supervisor. But that point of fact didn't matter. That point of fact was not the dispositive issue. The dispositive issue was what were the facts that led to that conclusion. And that HR investigator took the statement of the supervisor who claimed to be shoved, as well as two outside supervisors who had observed the incident. Interestingly enough, that HR investigator did not have the statement of the plaintiff in that case, partly because the plaintiff didn't offer it. But even so, that one-sided investigation that the plaintiff argued, not getting his opinion, not getting other outside opinions, was still sufficient for the Tenth Circuit to find that the HR investigator in that case had honestly arrived at his conclusion. And here, the same is true. The appellant has not offered any facts to even suggest that somehow the conclusion that was come to by Ms. Hutton and Mr. Gross was somehow unworthy of belief. Now, outside of that, he would also have to show some sort of racially discriminatory animus by Ms. Hutton or Mr. Gross. And in this case, Ms. Basie admits in her deposition that she has no reason to believe Ms. Hutton or Mr. Gross were racist. She also has no reason to believe that Sean Wise, the person on the phone, harbored any ill will towards her. Her admissions are found at 156 of the record and 148 of the record. And when it comes to racial animus at all, or any sort of racially discriminatory, oppressive environment that she allegedly suffered from, this all comes down to one comment. And she admits she knows of no other comments. One comment in the record by Ms. Laminack, C&I doesn't dispute that it occurred. It occurred, but how it's connected to her termination, appellant makes no case for. Appellant identifies no comparators, identifies no other African American employees who were allegedly discriminated against, who suffered adverse employment actions. There's literally one allegedly racist comment, and then an event, an event that was investigated, an event that had with no evidence of racially discriminatory animus, and no evidence that the conclusions made were unworthy of belief. All the appellant has offered here are opinions, opinions completely unsupported by the record. And for those reasons, unless the court has any other questions, I'm going to complete my remarks today. Thank you, Ms. Tran. Mr. Batten has time remaining. Thank you, Judge. You know, I believe we have shown the issues that we were concerned about, and sometimes you can have just a singular incident. But Ms. Bassey described the problem she was having with Ms. Laminack, that she was going to go out to her daughter's wedding, and Ms. Laminack stopped that, made her go to work, turned that around. The fact that she was involved in what I would say is an ego activity, because she believed that Camille Wade, a Black female new employee, was being harassed, and she went down to confront Sandy Laminack, who was the basis of this order she brought it up. Although she said she didn't generate the order, Ms. Bassey indicated there was something wrong with the way she did that. The other problem that we were showing... I don't understand that. Could you say that again? Ms. Laminack had nothing to do with the form that was filled out, right? That Ms. Bassey was upset about. Ms. Bassey said that the form was completely out of the ordinary because she was there with Ms. Wade. She said she did nothing wrong. She did everything she was supposed to. Ms. Bassey was sitting there with her. The person that signed that form... Ms. Laminack didn't fill out the form, right? No. Somebody else came with it, but that's part of the problem that we were trying to identify. This other person's form was so unusual that it came forward. It wasn't identified through her supervisor when it was supposed to be gotten, and it was a very unusual procedure. Just like when you walk in the office, you hand the form, and I think what Ms. Bassey did testify is, you did this. That provoked Ms. Laminack into screaming and saying, don't yell at me, don't do this. She's got some guy on the phone, and she's waving the phone, don't yell at me. I've got two other employees leaving, and I believe they are identified in the record. Could you tell us where in a 28J? Yeah, in 28J. 10 seconds, I can't. I'm sorry. I had it earlier, and I didn't list it, but I can bring it to you. Could you submit in writing a letter under Rule 28J that gives us the record site where those witnesses are identified? Yes, Judge, I will, and I appreciate your time today. I see I'm out of time unless there's any other questions. All right. Thank you, counsel. The case is submitted, and we will move to conference.